Mr. Chief Justice, and may it please the Court, for over a century the following three things have been true in the disputed area. First, the non-Indian population has always been greater than 98 percent. Second, the tribe never exercised jurisdiction. And third, by contrast, the state of Nebraska has governed the disputed area. The story of the disputed area is that of a land that long ago lost its Indian character, if it ever had any. The three things I mentioned at the outset happened for a reason. They happened because it was the intent of Congress in the context of the times of the 1882 Act that the disputed area would be diminished from the reservation. Kennedy, if I understand your position correctly, you're not asking us to overrule Solem? No. No, Your Honor. We are not asking you to overrule Solem. In fact, what we are asking the Court to do is to imply the entire Solem rule, and in particular the compelling third factor of the subsequent circumstances of the land's jurisdictional history. As the Court From what you just said and from your brief, I gather, perhaps I was wrong, that you are arguing for a de facto diminishment test, that as you pointed out, the area has been overwhelmingly populated by non-Indians, and they haven't attempted before to exercise governing authority. Your Honor, we think the de facto diminishment does fit within the third element of the Solem test, which is the subsequent circumstances of after the enactment. And so, obviously, we would not be opposed to the Court concluding and reaching this decision on the grounds of de facto diminishment, but we also think this case fits within this Court's precedent under Solem, which would involve, in our view, the third element of the test is particularly strong and compelling in this case, while in Solem, in that particular case, it was — it was, I guess I would call fairly easy to distinguish, because as Solem talks about, as far as the events, what took place after the Act, the focus should be, if you are looking at intent of Congress, you should be looking at what Congress is doing after the Act that is reflective of not understanding, essentially, that they have diminished the reservation. Scalia. It's a different Congress. I mean, to say, you know, a later Congress did thus and so, and therefore the earlier Congress, when it enacted a particular statute, must have diminished, that doesn't make any sense. And moreover, if the third factor is dispositive, as you assert, you would not — we have a de facto diminishment doctrine, whereby, by a sort of, you know, adverse possession, a jurisdiction, whether it's Indians or even a State, that used to have a jurisdiction over a particular area, has forfeited it by long, long-accepted usage to the contrary. If that is true, and if the third factor is as important as you say, we would not need that doctrine. We would just find diminishment. Well, and that would be consistent with the concept that if a party just — if they belatedly assert a claim to having sovereign authority over this, as in this case it was over 100 and some years after the land was open for settlement, that there are at least the Sherrill case, some of the principles in that case would be supportive of de facto diminishment. Ginsburg. Sherrill case didn't involve the diminishment. Diminishment was not an issue. That is true. What I was referring to was the principle, at least cited in the case, as far as a long-standing assumption of jurisdiction by the State over an area that is primarily non-Indian in population land creates justifiable expectations. And if they did have any sovereignty over it, they had long since forfeited. Scalia. But that's not what you're arguing here. I understand you're arguing diminishment. Not adverse possession, so to speak. We are arguing that it's no longer part of the reservation. We are not saying it — the Court could not find it under the de facto, but we do think the facts of this case does fit within Solemn. And if the Court applies the Solemn test, the State should prevail in this case, which is able to do so. The other side says you did not raise a City of Sherrill argument. Do you agree with that? We have — we have— A lot of the — a lot of the arguments you make seem to sound more in a City of Sherrill type proposition, but you haven't raised that argument, have you? We — I believe in paragraphs or pages 22, I think it's 25 of our brief, we are at least citing Sherrill as precedent for the principle of loss of sovereignty, loss of sovereign control by the fact that the State has long exercised the jurisdiction. But our focus— Ginsburg. But what do you make of what Solemn said? Solemn did bring up a de facto diminishment. This is on page 471 of the opinion. It says, on a more pragmatic level, we have recognized that who actually moved onto the open reservation lands is also relevant to deciding whether a surplus land act diminished a reservation. Where non-Indian settlers flooded into the opening portion of the reservation and the area has long since lost its Indian character, we have acknowledged that de facto, if not de jure, diminishment may have occurred. This was the theme that was picked up in Sherrill, but it's stated in Solemn.  Yes, ma'am. May I ask a preliminary question? We're talking about a liquor license or alcoholic beverage license and a sales tax on alcoholic beverages. Does the State itself impose such requirements, that is, a licensing requirement and a sales tax? The State itself does impose liquor license requirements. They can't impose the State of Nebraska has sales taxes, yes, Your Honor. This tax was not imposed by the tribe, the Quah tribe. This was a statute of Congress that permitted the Indians to do this, correct? My recollection was the Interior Department approved the tribe's request to have such an ordinance, and then the tribe's ordinance then was in effect. By our jurisdiction, tribes can't tax at will. They have to get approval for taxation, correct, from the Federal Government? Your point would be correct, Your Honor. The tribe has to request it. They have to have an ordinance. It has to be approved by agency of the Federal Government. Yes, that is true, but it still involves granting authority to another tribe. What else do you lose if this ruling is against you? We've already circumscribed the powers of the tribes on their own reservations greatly. So what powers do you lose? You've already ceded to the Federal Government criminal prosecution powers, so you're not losing out on that. What are you losing out on? Well, Your Honor, I take this would be in the context of what are the justifiable expectations of those who live in the disputed area, what would be significantly disrupted as far as their justifiable expectations. I would start off with the first principle is just who governs you. You would be introducing an additional sovereign, the tribe, into an area of which for over 130 years the tribe has not exercised any sovereign authority at all. Mr. Smith, can I take you back to Justice Scalia's question? You know, because usually, at least now, we don't think much of subsequent history of any kind. And maybe they thought a little bit more highly of it in the days when Solem was written. But now it would – it's pretty much of a stretch to use subsequent legislative history or subsequent history generally when we're dealing with interpreting a statute. And I'm just wondering, is there a reason why it should be more credited here than in any other context? The Court's precedent, I believe, recognizes in the area of land surplus acts that the Indian land surplus acts are a unique animal from your normal legislative analysis, and that would be because in the context of the times back before the turn of, I guess, two centuries ago in the 1800s, Congress would be doing land surplus acts in which the concept of are we diminishing or not diminishing a reservation was really nothing that Congress thought of. You put that on the basic principle that only Congress can diminish a reservation, it then becomes the problem of how do we determine what Congress intended when, frankly, the reality of the Court's precedent is it's something the Court or Congress generally did not think of. They were inconsistent. And so the – the Solemn test really evolves out of an attempt to determine what was the intent of Congress at the time, which then is why legislative history or subsequent circumstances takes on greater significance. And we're not going to diminish a reservation. Ginsburg. When did this diminishment idea as a legal concept, you said when Congress acted as if they weren't thinking in terms of diminishment, when did diminishment become the big question? Well, it becomes a big question when the issue is, is it part of the reservation? But at what point in time? Because you – I thought you just made this statement that in 1882 Congress wasn't thinking in terms of diminishment. It becomes a big issue when the issue is who, frankly, who has authority to govern? Is this still part of the reservation or not? Does the tribe have any authority over this area at all? And if it's part of the reservation, it has authority, acknowledged. It is limited authority. But it would have authority over it because if it's part of the reservation, now we give it to the tribe. On that question, as a practical matter, if the tribe were to exercise the outer – go to the outer limits of its authority, what could it do in the city of Pender? Well, what it can do, it would – it can displace State jurisdiction over environmental regulations that this is a rural farming area. The environment is very important. State regulation is very important. It's what the people have expected. And I could give an example. If you're a farmer and the guy across the road drops a load of manure in your pond that's being used to feed cattle, you call the State of Nebraska, you want them to come out and you want them to do something, those regulations would be replaced. You call the State of Nebraska and the response is, I'm sorry, you called the wrong number. Scalia. What about municipalities? What about self-governing or more or less self-governing municipalities? Are there any of those within this area? Yes, there are self-governing municipalities. There are villages, county, obviously. What would happen to them? Would they continue to exist? They would continue to exist, but you're going to have what I would say the ambiguity of the extent of their authority versus the extent of the tribe's authority. You would have this ambiguity in which is going to be, I mean, people for 130 years, if you've expected the State of Nebraska, your city council, to be exercising local control and you bring in this outside authority. Why would they continue to exist? I mean, aren't they creatures of the State? They are. Can the State create municipalities on Indian reservations? I believe the State can create the municipalities. The issue is what authority they have when you also have it on tribal land, because the tribe has to have authority. Sotomayor, I'm sorry, the tribe has acceded to State sovereignty in the environment and in all sorts of things. Have they threatened to take away the State's activities in this village? Not yet. The issue is going to be the... This tribe is awfully small. You think they're going to have the power to implement all of these things that you are fearful of, to do substitute services, to they can't tax for it without the government's permission, so how are they going to do all of these and why would they do all of these horrible things? Well, I don't think it's... I mean, it's nice to have the power of taxation, but they still need the government's approval. I don't think it's simply the test of being what will they do. I think the issue is once they have the authority, what's going to be the last thing they're going to do? Sotomayor, what it is City of Sherrill says, if they try to exercise their powers in a way that's harmful to settled expectations, they might have a remedy in law. That's what City of Sherrill says, but that didn't take away the City of Sherrill didn't say the Indians weren't sovereign. It just said they can't exercise the sovereignty. It didn't say it was a diminishment. What they said is they couldn't exercise it because of latches. Well, if you say we've introduced a tribe that in theory has authority, but because they've never exercised it, they really have no authority, that by itself, I would say, is the inherent ambiguity of what is actually the limits of their authority. You get litigations that starts disputing whether, like under the Montana factors, as far as they could regulate conduct that threatens, has some direct effect on their tribe's integrity, economic security, health and welfare. That's very, very broad. And to me, the answer would be simply to say this is not part of the reservation rather than every case that comes up when we have litigation and then decide, well, you're stopped from doing that. Does the tribe exercise authority in the part of the reservation that's not at issue here? Yes. The tribe absolutely exercises authority in the part that's not part of the reservation. They've stipulated to that, that on the part that's not part of the reservation, that they have ordinances, they provide services, that they enforce their ordinances on the east, in the eastern part of the railroad, which is clearly within the tribe, and not on the west. So they have had no presence, and they've acknowledged that. They have no tribal offices, schools, industries, businesses. They've admitted that all of these governmental services are provided by state and local agencies, not the tribe. That's the public expectation. That's what they expect is. In the western part? In the western part. Well, what about in the eastern part? I'm sorry, Ed, if I wasn't clear. In the eastern part, the tribe does have its ordinances. It does provide services. It does enforce its ordinances and laws in the eastern part, but not in the western part. Never has. All of those services are provided by the state of Nebraska. The state of Nebraska, you name it, in the form of government services, have been provided by the state of Nebraska, its municipalities, not by the tribe. This comes in, we come in, we're going to tax you, we're going to take the money, and maybe you get services, maybe you don't. And in fact, the idea of local control is if the people in the disputed area are unhappy about what the tribe is doing, unlike if it's their local city council, they don't get to vote, they don't get to remove them from office. In fact- Mr. Smith, I can understand why people might be concerned for all the reasons that you're talking about. We do have pretty clear and subtle law in this area with respect to diminishment. That we've said only Congress can diminish, that the idea is that we're supposed to look to congressional intent. And you say Congress didn't really think in these terms, and there's something that's fair about that. But Congress did use very different language in different ones of these acts. And we've looked to that language as a pretty good guide to suggesting which ones diminish and which ones do not. And it seems as though the language here in the act in which we're concerned, it's none of the language that would suggest that Congress diminished this act. So I was wondering if you could talk to that. Is there anything in the language of this statute that suggests a diminishment? Any of the usual kind of we cede everything, we relinquish everything? Like what's the best you can do on that? Appreciate that, Your Honor. And yes, the standard diminishment test starts with looking at the act. Is there language in the act? Hagan and Solem both specifically say no particular form of words are required. What we do have in this act is we've got two areas of the reservation. The area west of the reservation, it's a very well defined area. It doesn't create a checkerboard effect. What is significant is the act treats the area west of the railroad different than the area east of the railroad, specifically, and this was a major distinction in Solem. There is nothing reserved for the tribe in the land on the west of the railroad, the disputed area. There is nothing reserved in the bullpen, so to speak. There's no reservation of land use rights. There's no reservation of land use rights for schools, agency, tribal, religious purposes. No reservation in mineral rights. In Solem, those were considered significant factors because what you end up with is that the tribal headquarters, its governmental headquarters, ended up in Solem being in the disputed area. Scalia. Scalia. Counsel, do you agree that city of Sherrill did nothing more than deny particular equitable relief and did not repudiate the proposition of Indian sovereignty over the land in question? Because if you agree with that, then I guess I'm more inclined to give greater weight to the third factor. But if you disagree with it, as I think you ought to, then I don't see why we need the third factor. Well, city of Sherrill, it does have the element of the tribe trying to unilaterally just buy the land. Yes, but it says the tribe doesn't have sovereignty is what it says. Well, it says the tribe doesn't have sovereignty just to buy land back and get back sovereignty that it had long ago lost. That's right. It applies equitable principles to say you're free. To say that the tribe does not have sovereignty. Yes. Yes, and I think it's perfectly reasonable for the Court to reach that conclusion with a land which long ago lost its Indian character, long ago they've never exercised any sovereignty, and then show up after the public, the descendants, everyone who's lived there, and after 130 years, you suddenly find out we've got an Indian tribe that somehow has some governmental authority over us. We've never elected them. We don't have any right to vote them out of office. If we don't like what we're going to do, I guess we can complain to somebody, but we can't recall members of the Tribal Council. It's a recognition that those things happened because that's what Congress intended to have happen, and as Solem looks in the context of the times, as far as that legislative history or what happened afterwards, Solem emphasizes the decades immediately after the Act, and in the decades immediately after this Act, we don't have what Solem talks about, the rife with inconsistencies. What we have is a total 100 percent consistent record that everyone understood. This land was diminished. It's not part of the reservation. Congress in 86 years later, and I understand the point about subsequent congressional intent, but at least they did not take an action that would reflect Congress didn't understand what they did. Kagan Mr. Smith, on the City of Sherrold point, the Chief Justice asked you before, do you agree whether this was — whether this is waived, and you said, well, we cite City of Sherrold on page 25 or something like that. Below, what was the status of the City of Sherrold argument in the lower courts? Smith In the lower courts, the argument — the argument was made as far as that de facto diminishment can be found. The Eighth Circuit's opinion is what I would call essentially a summary. Kagan I'm not sure — I'm not sure quite what that means. Does that mean de facto diminishment under Solem, or does that mean — Solem, or does that mean that you talked about City of Sherrold as an independent ground? Smith We talked about de facto diminishment as an independent ground. I didn't argue it in the — but my recollection is Sherrold is not cited for — as authority for that, but we did make the argument that it was de facto, because Solem does say we have recognized de facto diminishment. Mr. Chief Justice, if I may reserve the remainder of my time, if there's no further questions. Roberts Thank you. Mr. Clement. Clement Mr. Chief Justice, and may it please the Court, the question in this case is whether an 1882 act of Congress diminished the Omaha Reservation and redrew its boundaries. We think multiple considerations make clear that the act of Congress did not diminish the reservation, but simply opened up a portion of the reservation for settlement within the existing boundaries. Now, the first and probably most significant factor is that the text of the statute uses the classic language this Court has identified for opening up a reservation for settlement without creating a diminishment. But secondly, and I think very telling and specific to this statute, at the same time there is no language in the statute that supports a finding of diminishment, I think there is language in the statute, specifically the final proviso of Section 8, that is very inconsistent with the idea that what Congress did is draw a new western boundary to the reservation, because that proviso gave tribal members the right to take their allotments east or west of the right-of-way. And the record reflects that many — that a number of members of the tribe took their allotments west of the right-of-way, and importantly, a number of them took their allotments east or west of the right-of-way and straddled the right-of-way. Roberts, a number, what is the number, 9? There were 15, I think, with the parties disputed, between 10 and 15, about 850 to 900 acres. But I don't think the fact of the fact of how many that took allotments, how many tribal members, I think there were roughly 300-plus allotments, so it was, you know, 3 percent. But I think the fact that they were allowed, even though they are small numbers, I'm not trying to make a volume argument here. I'm making an argument that if what Congress just did was draw a new western boundary to the reservation, it would have been very odd to allow tribal members to take their allotments off the reservation, and maybe odder still to allow them to take an allotment that essentially was bisected by the new boundary. Roberts, why would that be odd? They could have taken allotments anywhere, couldn't they? Within the area it was opened up, couldn't they have chosen to purchase or take their allotments outside the reservation? Clements, I don't think that would have been a logical assumption, given the conception of the time where I think Congress was thinking, in the main, that tribal ownership or Indian ownership went with the reservation status. And I think, again, if you think of this as being a surplus land act that simply opens the reservation up, a portion of it, to settlement, then it makes perfect sense to say the tribal members can take their allotments anywhere on the reservation. But if you think you've really drawn a new boundary to the reservation, then I think it's more than passing strange that you can take allotments to the west of it, or you can take an allotment and the new border is smack dab through the middle of it. That seems odd. I don't understand your answer to the Chief Justice's question. An Indian who wanted to have an allotment off the reservation, and allotments were generally available, could take that allotment off the reservation if the Indian chose to do so, correct? No. My position is, no, they couldn't. And they could take it west of the right-of-way, but I am saying that's powerful. So allotments were only open to non-Indians? No, no. Before any settlers, non-Indians came in, the existing tribal members were allowed to take their allotments. And they were allowed to take their allotments anywhere on the pre-existing reservation. All right. So we're not talking about allotments open to the general population. No. No. And this is clear from the proviso in section 8. It's the allotment only for members of the tribe. And they can take, consistent with the historical understanding, an allotment anywhere on the reservation, including west of the right-of-way. And that seems to me to be very consistent with the idea that the right-of-way is an interesting thing that the tribe granted through their reservation, but it's not some new boundary. And I think the subsequent history really supports that as well. I mean, my friend on the other side — But what do you make, Mr. Clement, of the language that I read from Solem itself, which seems to fit this case? Well, I take that language, Justice Ginsburg, as Justice Marshall writing for the Court saying that when you're in the third factor, when you witness de facto immunity — I'm sorry, de facto sort of diminishment — that that may ultimately support a conclusion that there was, in fact, diminishment as a matter of law. I don't take him to be opening up an entirely different route to finding immunity — diminishment, rather — that doesn't go through an act of Congress. And I think that's the only way to read the opinion as a whole, because when the Court starts the opinion, it says the very first principle in this area is that only Congress can diminish a reservation. And it's perfectly compatible with that to say that when we get to the third factor and we're looking at all sorts of things, we'll look at settlement patterns as part of that, but I don't think it's consistent with that worldview to then say that actually the third factor is a stand-alone, alternative route to find diminishment, not by congressional action, but by market reaction to a surplus land act. Did we cite Solem in Sherrill? I don't really recall. I don't recall. If it had held that, it would have been cited and Sherrill would not have been any big deal. Well, I think— I thought Sherrill was a big deal. Well, I think— Justice Ginsburg wrote it. I think she thought it was a big deal. I'm not here to tell you it's not a big deal. I am telling — I'm here to tell you two things, though. One is that Solem went out of its way to not decide the diminishment issue. So it is clearly an alternative way of thinking about the cases, and I don't think they're coextensive, which is to say I think there could be a particular assertion of tribal authority that you might say violates city of Sherrill principles even within an undiminished reservation. And I do think it's then critically important that my friend on the other side has not raised this argument below. I certainly did not understand it to be an independent argument in this Court. It's all well and good to cite the case, but that doesn't make it an independent argument. Even his amici, who thought that they wanted to bring before this Court the city of Sherrill argument, admitted that the Petitioners hadn't made a city of Sherrill argument. Roberts. But Solem did talk about de facto diminishment, and it seems to me that you've got to recognize when they do that they're talking about something other than de jure, in other words, pursuant to the law. It's pursuant to the facts on the ground. Clements. I understand, Mr. Chief Justice, but I think there's two ways to talk about de facto versus de jure. One way to talk about it is that there are two totally alternative routes. Another way is to say de facto diminishment means the settlement patterns, and that's something that can inform the ultimate conclusion of whether there's diminishment. And I really think the Court in Solem was using it in that passage in the latter respect, and I think that's the only way to make sense of the case as a whole. Because the court turns to apply the principles. Exactly. That's right. It's part of the general principles of the Court. It's not tied to the third factor. Well, I take it, though, that it actually is, in my view, tied to the third factor. I think Justice Marshall was laying out all of the factors, starting with the first and governing principle being that only Congress can diminish, and he winds up the sort of general principle section with this last thing about de facto de jure, de facto diminishment, and then that ties up exactly to his discussion of settlement patterns in the third factor of Solem. And I really think that's the right way to read that opinion. I would like to make one other very important point here, though, as I think the Court should understand, that if you were to rule in favor of Petitioners in this case, the parties would essentially have to go back and reconstruct the right-of-way. Because the railroad's no longer there. There's no Rails for Trails program in Thurston County. So if you take a Google map and look at this area, you can't even tell where the right-of-way was. Now, I think that's significant, because if there really was a contemporaneous understanding in the 1950s and 1960s when the railroad literally pulled up its tracks and left, that the right-of-way was the boundary of the reservation, then I think there would have been some effort to sort of preserve that jurisdictional boundary. Kennedy, please correct me if I'm wrong from the record. My understanding was that in the west portion, the tribe had done — had exercised no jurisdiction until the Beverage Control Ordinance recently, but on the east portion that they had. But then you say, well, we can't tell the difference in east and west. I mean, is that reading of the record mistaken? Well, I think what there is, is a practical understanding, as Justice Sotomayor indicated, this is not a wealthy tribe that's looking to assert jurisdictions in places that are impractical. So it's made a judgment that most of its efforts are directed at the eastern portion of the reservation. But what I'm saying is that the fact that nothing — if the record is correct, let's assume the record shows that the tribe exercised no jurisdiction over the western portion until this Alcoholic Beverage Control Ordinance. Is that relevant to the case at all? I don't think it's dispositive. I think, yes. Is it relevant? Yes, relevant. Why is it relevant? Why is it relevant? To what point? I think it could be relevant to the third factor of solemn in a case where the situation was very cloudy. But one of the things also to keep in mind is that even before Montana, the authority that a tribe would have over a principal non-Indian settlement on a reservation is fairly limited. And it varies — Limited to what? What's that? What is at stake beside the alcohol tax, sales tax? What else, on your theory, could the tribe do in the way of governance in this area? I think as a practical matter, Justice Ginsburg, there's two other things that are at stake here, and they both go to the equities of the Indians on the reservation, not the non-Indians, because the non-Indians on the reservation, the tribal authority is very, very limited. So one thing that is at issue here is the potential to continue the revenue-sharing agreement with the State. And this is something that the State actually came to the tribe about. And the theory of the revenue-sharing agreement for the fuel taxes is that there are going to be transactions in the western portion of the reservation where it's actually tribal members that are buying gasoline over there, which does happen, because there are a lot of gas stations over there. And of course, the tribe would have authority to tax the tribal members on the reservations for those — for those transactions. So what — Kennedy, you know, Justice Ginsburg, you asked your question, you said it was a practical matter. I thought, maybe I misinterpreted your question, as a legal matter, as a legal matter, if you prevail, can the tribe cast any doubt on the authority and the jurisdiction of the existing municipality? No, not at all. What they can do is they can make cooperative agreements with the State of Nebraska to tax Indians when they make purchases in Pender. And the other thing they can do is that when two tribal members get in a scuffle in the village of Pender, the tribal authorities can be contacted, and that matter can be handled in the tribal court rather than in the State court. But if this is a — if the city of Pender is in a reservation, under what authority could the town of Pender regulate things that go on in Pender? Under its authority — first of all, I mean, you know, let me say two things. One is, I'm not even sure, because of the retrocession under — after Public Law 280, it's not even clear to me that Nebraska ceded its civil jurisdiction that it enjoyed under 280. The retrocession, as I understand it, was criminal retrocession with the exception of the motor vehicle laws. The second thing, as a practical matter, I think this is very important to understand. The next town east from Pender is the town of Walt Hill. It is unambiguously in the reservation boundaries. It is an incorporated municipality of the — of sort of civil government in Nebraska. In the Winnebago reservation — Well, just educate me, because I don't know the law on this point. Can — excuse me. Can a State incorporate municipalities within the boundary of an Indian reservation? Yes, it can. And it does, and it's quite common. And what this Court — in fact, this Court in the Seymour case, one of its earliest diminishment cases, confronted a Federal township, Omak, Washington, that had always been a township. There's civil authority there, but it's still on the reservation, and that is actually quite common. Does that displace tribal authority in that area? No, because, again, remember, the tribal authority over the non-Indians is so small. Well, we're talking about the area. I mean, could tribal police patrol within the municipality? I think they probably could, though only really with an eye towards seeing if there were Indians there who were, you know, needing patrolling. And there's some evidence in the record, this is at Joint Appendix 371 and 372, that there were occasional patrols of the tribe into Pender. There's also a footnote in that same section that says that as a practical matter, when a tribal member was apprehended in the village of Pender, the police officer would call over to the tribal authorities and have them take over the person. So there's overlapping jurisdiction, the municipality and the tribes. Yes. Within the city? Within the city. And one other aspect. Doesn't that create conflict? No, it really hasn't created significant conflict. And what eliminates the conflict is your Montana decision, which substantially limits the tribe's authority over the non-Indians. But the liquor tax that we're talking about is not imposed only on Indians, right? It's imposed on everybody who buys liquor in Pender. It is, but that is the exception that proves the rule, because alcohol on reservations has been a unique Federal authority for as long as there have been Indian reservations. In fact, this Court had a case in 1911 arising out of the Omaha Reservation where it reaffirmed the Federal authority. So the reason I'm saying that's not true is because it's not true in Nebraska. I don't think that's actually true on the ground in Nebraska, at least as to the highways. Because when they retroceded authority in 1970, there was no reason for it to be true. Well, you had the example of a scuffle. Suppose an Indian and a non-Indian are in a scuffle. If there's a minor criminal statute making this a minor offense, does the tribe have jurisdiction over the non-Indian? I don't think that it would within the village of Pender. And I think that is a reflection of the very limited authority that the tribe has over non-Indians. And that's true with reference to all Indian tribes? Can you cite me any proposition for that? Well, ultimately, it might be a — it might turn on the scope of the Montana decision. And obviously, this Court has the Dollar General decision in front of it. I want to make one more point, if I could, about the overlapping authorities here, because the other authority here is Thurston County. If I just finish this one point, Pender is the county seat of Thurston County. Thurston County has always, by State statute since 1922, its western boundary has been defined as coextensive with the reservation. And there are tribal members whose one of the council members on the county is a tribal  Thank you, Your Honor. Thank you, counsel. Mr. Kim. Mr. Chief Justice, and may it please the Court. In Solem v. Bartlett, this Court explained that once a block of land is set aside as an Indian reservation, and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise. It has not done so here. I'd like to start, if I may, with the question, what would change if this Court were to rule that the reservation is still intact? First of all, with respect to services, States can provide services to members of tribes and nonmembers alike anywhere within the reservation. And the State of Nebraska provides services not only in the disputed area, but on the east side as well. Let me give you a very specific example. There's a town called Bancroft, which is split in half by the right-of-way. There's another town called Rosalie, which is clearly within the eastern undisputed part of the reservation. There's a school district called the Bancroft-Rosalie School District, which is administered under the auspices of the State of Nebraska. And that's true, notwithstanding the fact that much of the land is on the east side, and true, notwithstanding the fact that many members, many students who go to that school are members of the tribe. Similarly the State can do, but the State wouldn't be obliged to do that, wouldn't be obliged to provide schools. I see no basis for the State to refuse to provide services to its own citizens, especially if they are not members of the tribe. Roberts. Well, it would be a question of sovereignty. The State. This is the reservation. That's your argument. It's the reservation. And that's not the State land. So we're going to spend our money for schools or whatever on the State, not on the reservation. The State retains regulatory sovereignty to make laws with respect to its own citizens and nonmembers on a reservation. That's true on the east side. It's true on the west side. I think you also may be left with the impression, after my friend's argument, that the State would stop issuing environmental permits and all of a sudden the tribe would start issuing them. That is not correct. First of all, the Environmental Protection Agency has been administering on the west side of the reservation, including providing permits for animal feedlots. There's also a permit for wastewater. Roberts. Environmental Protection Agency, State or Federal? Federal. Federal. Including a permit for a wastewater treatment facility, although I believe it discharges into Logan Creek on the east side, so it may not tell us all that much about the jurisdiction. But our questions have been, suppose that you prevail, what can the State do? And we say, well, it's a practical matter, don't worry, they won't do it. The tribe won't do anything. The tribe won't do anything. What could the tribe do? What could the tribe do? Yes. To regulate non-tribal members. So the things that the tribe could do would be any express delegation of authority from Congress. The only one that we've heard about is the alcohol ordinance. Beyond that, the State and tribe could go back to the different. We heard about the fuel, the revenue sharing. That's right. There was an agreement to share revenue fuel, although that was something that the State entered into voluntarily with the tribe. Beyond that, the tribe would have to fall under one of the two Montana exceptions, which are, as this Court is very aware because of the Dollar General case, very limited. I want all of that. Roberts Well, I suppose one reason the tribe might not provide services is because the area is 98-point-whatever-percent non-tribal, right? I think that's absolutely correct. So they would be, if any services would be for the, how many, nine Indians in the area, or 15? Pardon? How many non-Indians own land in the western part? It's almost entirely non-Indian in the western part. And for that Scalia Couldn't the tribe enact ordinances that govern the Indians in the western part? They could, but if we're talking about the effect on non-members, they would have to fall under the one of the two Montana exceptions. Scalia But at least as to tribal members in the western part. That's right. Tribal members on the reservation. Scalia They would be subject to the tribe's jurisdiction, which they otherwise would not. I think that that's accurate. If I could go to the City of Sherrill argument, which got brought up a lot today. I think this case is extremely different from City of Sherrill for a number of reasons, but let me give you two big ones. In City of Sherrill, this Court held that principles of equity restrained the tribe from trying to resurrect a claim of inherent sovereign immunity. In this case, by contrast, first of all, we're not just talking about the tribe's jurisdiction, we're talking about the jurisdiction of the United States as well. And second of all, we're not talking about a claim of inherent authority. This is authority exercised pursuant to a Federal statute, 18 U.S.C. 1161. And for that reason, principles of equity simply don't apply here. Moreover, in City of Sherrill, the Court applied a laches-type reasoning, but laches  exercise of authority under a Federal statute and express delegation of authority under Federal law. Roberts, because that's what the Court said, for instance, in the copyright decision that Justice Ginsburg recently wrote, which is that when you have background principles of equity, they are presumed not to be applied and be displaced when there is a substantive law that Congress passes to deal with the same issue. Roberts, the law that authorized the imposition of these taxes in the western part of the reservation? The law authorizes the exercise of this authority if there is a reservation and if the tribe applies to the Department of the Interior, which has to approve the ordinance. Well, doesn't that beg the question? The question is whether or not this reservation has been diminished. So it's not the reservation. Well, that's the question with respect to the application of the statute. But when we're talking about City of Sherrill, we're talking about background equitable principles. And I'm simply making the point that those principles don't apply when you have an express congressional statute dealing with the same issue. Sotomayor, if the City of Sherrill did apply. Pardon? If the City of Sherrill did apply, hypothetically, I'm not naysaying all the differences you're pointing out, would you lose? No, because, again, we're not talking about just what the tribe can do. We're also talking about the jurisdiction of the United States as well. And there is certainly nothing in City of Sherrill which suggests that the jurisdiction of the United States pursuant to a congressional creation of a reservation can be curtailed by the tribe's failure to exercise authority in the disputed area. Scalia, I'm more inclined to vote your way if the City of Sherrill does apply than if the City of Sherrill doesn't apply. Well, what you're telling me is unless you get there through Solem, it doesn't matter whether the State and non-Indians have for generations viewed this land as their own? That's what you're telling me, right? Well, I'm telling you that to the extent City of Sherrill applies, it applies to a very different question, not the question as to where the borders of the reservation are. It applies to the question, what can the tribe as a basis of its inherent sovereignty do? Now, it might under different circumstances if the tribe tried to repurchase a bunch of land. That's not what City of Sherrill said. Sherrill said the tribe had no jurisdiction. He said it had no sovereignty over the area anymore. Again, the diminishment question goes not just to the tribe's sovereignty, but the jurisdiction as well of the United States. And if we're talking about expectations, another point that I would make is that the single best evidence of what these parties could have expected is the retrocession, because that was a unique moment in which the State of Nebraska and the United States talked directly and officially to one another about the burdens and responsibilities for exercising jurisdiction in the reservation. And the United States, in the Federal Register, as official as can be, said the entire reservation remains intact. And the State of Nebraska, as we point out in our brief, had exactly the same understanding. The Assistant Attorney General for Nebraska came and testified before Congress that all of Thurston County is within the Winnebago and within the Omaha reservation. Scalia And that determines the meaning of the 1882 statute? Not in the least. It goes to the next point. That's what I think. I was simply responding to the point that the expectations here might be all in the same direction.  I would also like to address, if I could, the tipping point theory that I think emerges from Petitioner's reply brief, and that's the idea that in 1872, the State of Nebraska  of the Omaha and the Winnebago. In 1882, Congress tried but failed to diminish the reservation because there were only about 300 acres sold. But in 1882, it succeeded because a lot more land was sold. I think there are a lot of problems with this theory. First of all, if that was what Congress had in mind, presumably it would have specified some way to know when the tipping point had been reached, some percentage of land sales, some other measure of success. There's nothing about that in the text. There's nothing about that in the legislative history. Second of all, the concept that Congress could attempt but fail to diminish a reservation, as my friend said that it did in 1872, is a concept that is wholly foreign to this Court's jurisprudence, which makes clear that Congress has plenary power. And finally, I think this Court should be very reluctant to assume that Congress implicitly transferred any part of its authority to change the borders of an Indian reservation to private parties, and made it contingent on what this Court in Dakota referred to as uncertain future sales. Roberts. Well, is that saying there's no such thing as de facto diminishment? I think that de facto diminishment, if you think of it as some sort of freestanding alternative path to change the boundaries of a reservation, I do agree that it doesn't exist. But if you're talking about it How is that consistent with the language in Solem that Justice Ginsburg read? I think it's a little bit hard to know exactly what the Court meant. This Court has never found de facto diminishment. All seven of its surplus land cases were decided on the basis of congressional intent. And then there were sometimes a few sentences thrown in about how the status quo wouldn't change very much. I want to leave you with one more point. Scalia. What about Sherrill? Pardon? What about Sherrill? Sherrill is very explicit that it is not a diminishment ruling. There's a footnote in City of Sherrill which makes very clear that it is not deciding the diminishment issue or the jurisdiction of the United States. Roberts. What's vague about the language where non-Indian settlers flooded into the open portion of a reservation and the area has long since lost its Indian character, we have acknowledged that de facto, if not de jure, diminishment may have occurred? I think you have to read that sentence in light of Yankton Sioux, which says that when you're talking about the subsequent treatment of the area and the pattern of settlement, those are relevant only insofar as they bear on the touchstone of the inquiry, which is congressional intent. If I could make one final point. Roberts. Well, I think if you look at the passage, it goes on then to discuss, in addition to that, then we look to subsequent demographic history as an additional clue as to what Congress meant. I read those in the two different paragraphs as making two different points. I think you could definitely read it that way if you just had Solemn. I think if you read Solemn in light of Yankton Sioux, you reach a different result. If I could make one final point about unsettling expectations, there are more than 300 federally recognized Indian reservations all throughout the United States. The single most unsettling thing that this Court could do would be to suggest that the borders of those reservations depend not on what Congress said about them, but on shifting demographic patterns or who provides what services where. If there are no further questions. Roberts. Thank you, counsel. Mr. Smith, you have 4 minutes remaining. Thank you, Your Honor. Where do I start? I would start first with, pointed out to me by Coke Counsel, that a misstatement I made in response to Justice Kagan, the Eighth Circuit briefs do cite Sherrill in support of the proposition for de facto diminishment. My apology, I hadn't argued it at that point, but it is there in the Eighth Circuit. I would cite to the joint appendixes, so the Court is aware exactly where it can find, that is undisputed as far as the demographics, the jurisdictional history, JA215 to JA216, JA318 to JA319, JA609 to JA611. The concept that, gee, nothing really big is going to change. Having the tribal police show up in their police vehicles patrolling the streets, because it's on tribal land, is going to be a huge disruption of expectations. My background is in criminal law. I know if you have a crime you're investigating, you don't know, not all crimes, you know there's not a science saying, gee, this was committed by an Indian, this was committed by a non-Indian. You have a lot of whodunits in which the question is, who's supposed to investigate? You have this overlapping jurisdiction where law enforcement itself is confused as to who's supposed to be investigating when they don't even know maybe who the perpetrator is. The idea that a tribal member of a State governmental authority somehow shows. Scalia, wouldn't the latter be the case with respect to any municipality that's within a reservation? We've been told there are a lot of those. And wouldn't that be a problem in all of those? Namely, that you have overlapping jurisdiction of tribal police and municipal police and until you know who the perpetrator is, you don't know which one has jurisdiction. It's a problem if you know and chose to live on an Indian reservation. I mean, that exists. What's different in this case is the history is of 130 years of people who believe and chose and they are not living on an Indian reservation, they're living in the state of Nebraska. I call the state patrol. The tribal police are not patrolling up and down my street. That's the difference. It's the justifiable expectations of the people who live there. Breyer, their point is, the government says, fine, make that argument, make it under the rubric city of Sherrill. Maybe you make it when you go down on remand or something, but it is workable to divide the issue into two parts. The first issue is what's the reservation? And the second issue is what can you do on the reservation? When you get to question two, if the tribe has made no assertion of jurisdiction, nobody even knows about it for 150 years, maybe it's basically unfair to let them do what they want to do. And that depends on a lot of factors, such as what Congress says. Now, so what do you think of that argument? Let's leave it for later. Nobody's argued it. I'm glad I didn't answer what I thought of that argument. Your Honor, it is still the advice, the litigation over what is the extent of the power? Who's got the power to govern? What is the extent of their power? Uncertainty, when you have expectations, you live in an area where the state governs you, and then to say, we can go back and litigate all these issues, is just not what the public expects. The people in Pender, this is a big deal. They care about this. They have expectations. It's a big deal whether a tribal council has authority over us. We don't get to vote for them. Their Constitution doesn't even allow us to appear at their public meetings. The concept that somehow or other we can't find the right-of-way because it's not on Google is, frankly, silly. It's very easy to go back, do surveys, find exactly where the right-of-way is.  Roberts.